[This decision has been published in *Ohio Official Reports* at 94 Ohio St.3d 231.]

LOWNSBURY ET AL., APPELLANTS, *v*. VANBUREN ET AL.; STOVER, APPELLEE.

[Cite as *Lownsbury v. VanBuren*, 2002-Ohio-646.]

*Physician and patient—Physician-patient relationship can be established between a physician who contracts to provide resident supervision at a teaching hospital and a hospital patient with whom the physician had no direct or indirect contact.*

(No. 00-1655—Submitted October 2, 2001—Decided February 20, 2002.)

APPEAL from the Court of Appeals for Summit County, No. 19365.

————————————

### SYLLABUS OF THE COURT

A physician-patient relationship can be established between a physician who contracts, agrees, undertakes, or otherwise assumes the obligation to provide resident supervision at a teaching hospital and a hospital patient with whom the physician had no direct or indirect contact.

————————————

**ALICE ROBIE RESNICK, J.**

{¶ 1} This is an appeal from a summary judgment in favor of defendant-appellee Thomas Stover, M.D., in a medical malpractice action. The action was brought by plaintiffs-appellants Mary and Gerald Fabich, in their own right and as next friends of their adopted daughter, plaintiff-appellant Rebecca Fabich (formerly Rebecca Lownsbury), who was born severely brain damaged on January 10, 1995.

{¶ 2} In their initial complaint, filed January 19, 1996, appellants asserted various claims of medical negligence against numerous defendants, all of which arise out of the prenatal care and treatment provided to Rebecca's biological mother, Cathy Lownsbury, at Akron City Hospital from January 6, 1995 through

January 10, 1995. After extensive discovery, appellants settled with and/or dismissed all but two of the original defendants.

**{¶ 3}** On September 9, 1997, appellants filed an amended complaint in which they reasserted their original claims against these two defendants, added new claims, and named Dr. Stover as an additional defendant. As pertinent here, appellants alleged that on January 6, 1995, Lownsbury was given a nonstress test and an amniotic fluid index test at Akron City Hospital's perinatal testing center. Based on the results of these tests, George VanBuren, M.D., a defendant below, ordered that Lownsbury be taken to the hospital's labor and delivery unit for an induction of labor. However, rather than inducing labor as ordered, the obstetrics residents administered a contraction stress test, after which they discharged Lownsbury from the hospital the same day. The contraction stress test allegedly ran for two hours and twenty minutes and revealed repetitive late decelerations, suggesting fetal distress, but only an eighteen-minute portion of the fetal monitor tracing was reviewed, which showed no decelerations.

**{¶ 4}** Appellants claimed, among other things, that Dr. Stover was negligent in failing to supervise the obstetrics residents who actually cared for Lownsbury on January 6, 1995, and that such failure was a proximate cause of Rebecca being born permanently brain damaged on January 10, 1995.

**{¶ 5}** Dr. Stover moved for summary judgment on the sole ground that he owed no legal duty of supervision to Lownsbury or Rebecca because he and Lownsbury never had a physician-patient relationship. In his motion, Dr. Stover maintained that a physician-patient relationship cannot be found to exist between an on-call physician and a hospital patient unless it appears that the physician was either in direct contact with the patient or actively involved in the patient's care.

**{¶ 6}** In response, appellants argued that regardless of whether Dr. Stover had any contact with Lownsbury or the residents who actually cared for her, he nevertheless assumed the duty to provide Lownsbury with supervisory care by

2

contracting to serve as the on-premises attending and supervising obstetrician at Akron City Hospital on January 6, 1995.

{¶ 7} Appellants' supporting evidence tended to show that Dr. Stover was employed by East Market Street Obstetrical-Gynecological Co., Inc. ("East Market") "to provide obstetrical and gynecological services to patients at Akron City Hospital in accordance with the working schedule promulgated by the Board of Directors of East Market from time to time." East Market had entered into an agreement with Akron City Hospital ("EMS-ACH contract") to "[s]chedule sufficient PHYSICIANS to provide SERVICES on HOSPITAL premises twenty-four (24) hours per day, seven (7) days per week, consistent with accreditation requirements of the HOSPITAL Obstetrical and Gynecological Residency Program."

{¶ 8} The EMS-ACH contract also required East Market to "[p]rovide sufficient PHYSICIANS in order to perform SERVICES required by this Agreement so as to insure high quality professional medical care will be provided to HOSPITAL'S obstetrical and gynecological patients," to provide physicians "to serve on such committees and in such similar positions as are necessary * * * to collaborate with the Medical Staff," and to "[c]omply with all rules, regulations and bylaws of HOSPITAL and HOSPITAL'S professional staff."

{¶ 9} The contract provided further that East Market physicians "must maintain membership on HOSPITAL'S Medical Staff and clinical privileges within HOSPITAL" and "shall be subject to HOSPITAL'S Articles of Incorporation, Code of Regulations, Professional Medical Staff Bylaws and Professional Rules and Regulations." In addition, both East Market and its physicians were obligated to "perform SERVICES to patients of HOSPITAL in accordance with currently approved medical standards, methods and practices."

{¶ 10} Sometime between January 6 and January 10, 1995, Lownsbury signed a consent form setting forth conditions of admission to Akron City Hospital.

This document explains that "[t]he Hospital is a teaching institution     * * * for undergraduate, graduate and post-graduate education," and that "[s]tudents may participate in the care of the patient." It also confirms that these students are present for educational and instructional purposes "under appropriate supervision," that "[t]he patient will be under the professional care of a Medical Doctor called the attending physician," and that "[t]he patient * * * consents to hospital services as ordered by the attending physician * * * or * * * rendered under the general and specific instructions of the physician."

{¶ 11} Appellants also presented affidavit and deposition testimony of two medical experts who stated that Dr. Stover had a responsibility as the supervising physician on January 6, 1995, to familiarize himself with Lownsbury's clinical condition and particularly to review the contraction stress test by the end of his scheduled working day and formulate a plan of management. They opined that Dr. Stover should have maintained an operational presence in the labor and delivery unit, rather than sitting in the hospital's staff room "wasting time" until his help was requested (as Dr. Stover claimed he could do), and that had Rebecca been delivered even a day earlier, she probably would not have suffered permanent neurological injury.

{¶ 12} The trial court granted Dr. Stover's motion for summary judgment without opinion on July 22, 1998. In a subsequent order dated October 9, 1998, the trial court certified its judgment as final and appealable pursuant to Civ.R. 54(B) upon an express determination that there is no just reason for delay.

{¶ 13} The trial court's judgment was affirmed by a majority of the court of appeals, which held, "In order to establish a physician-patient relationship there must be some contact between the doctor and the patient." The majority recognized that such contact may be "indirect where the doctor takes an active part in diagnosing or treating the patient even without the patient's knowledge," but was unwilling to dispense with the requirement of contact in situations where the

physician expressly or impliedly contracts with the hospital to serve in an attending or supervisory capacity. Thus, while acknowledging that certain factual disputes remain as to Dr. Stover's contractual status and duties on January 6, 1995, the majority found that "[t]hese issues are not material to this case * * * because what is not in dispute is that Dr. Stover never saw, evaluated, [or] treated, [or was] consulted [about Lownsbury], or knew that Lownsbury was in the hospital."

{¶ 14} The dissenting judge stated that "once a physician-patient relationship has been established by contract, as in the present case, whether the physician actually knows that the patient is in the hospital is irrelevant." The dissenter further noted, "Dr. Stover consented to the relationship when he entered into the agreement [with Akron City Hospital] to be the supervisory physician. In turn, Lownsbury consented to the relationship when she signed the consent form to be under the care of an attending physician." Moreover, the dissenter contended, "[t]hose doctors who are employed to teach, supervise, and guide residents are not only permitted but also implicitly encouraged by the rationale of the majority's decision to shield themselves from liability with bureaucratic armor."

{¶ 15} The cause is now before this court pursuant to the allowance of a discretionary appeal.

{¶ 16} The question for review is whether appellants presented sufficient evidence to raise a genuine issue of material fact as to the existence of a consensual relationship between Dr. Stover and Lownsbury on January 6, 1995. Concomitantly, we are asked to decide whether a physician-patient relationship can be established between a supervisory physician at a teaching hospital and a hospital patient without evidence that the physician was either in direct contact with the patient, consulted by the treating residents, or otherwise actively involved in the patient's care.

{¶ 17} The existence of a duty is an essential element of proof in a medical malpractice claim. *Littleton v. Good Samaritan Hosp. & Health Ctr.* (1988), 39

Ohio St.3d 86, 92, 529 N.E.2d 449, 454. In turn, the duty of care owed by a physician is predicated on the existence of a physician-patient relationship. See, generally, Annotation, What Constitutes Physician-Patient Relationship for Malpractice Purposes (1982), 17 A.L.R.4th 132, 136, Section 2; Kohlman, Existence of Physician and Patient Relationship, 46 American Jurisprudence Proof of Facts 2d (1986) 373, 378.

{¶ 18} In *Tracy v. Merrell Dow Pharmaceuticals, Inc.* (1991), 58 Ohio St.3d 147, 150, 569 N.E.2d 875, 879, we explained:

"The physician-patient relationship arises out of an express or implied contract which imposes on the physician an obligation to utilize the requisite degree of care and skill during the course of the relationship. The relationship is a consensual one and is created when the physician performs professional services which another person accepts for the purpose of medical treatment.

"The physician-patient relationship is a fiduciary one based on trust and confidence and obligating the physician to exercise good faith. As a part of this relationship, both parties envision that the patient will rely on the judgment and expertise of the physician. The relationship is predicated on the proposition that the patient seeks out and obtains the physician's services because the physician possesses special knowledge and skill in diagnosing and treating diseases and injuries which the patient lacks." (Citations omitted.)

{¶ 19} This court has not considered the application of these principles to the complicated institutional environment of a teaching hospital. Indeed, our development of these concepts has thus far been confined to the context of direct one-on-one, face-to-face relationships between physicians and patients. Accordingly, we find it helpful to review those cases in which other courts have considered whether, and under what circumstances, to recognize a duty of care owed by a supervisory physician to a patient actually cared for by a hospital resident.

{¶ 20} In *Mozingo v. Pitt Cty. Mem. Hosp., Inc.* (1992), 331 N.C. 182, 415 S.E.2d 341, the Supreme Court of North Carolina held that a physician who undertook to provide on-call supervision of obstetrics residents at a teaching hospital owed the infant plaintiff and his parents a duty of reasonable care in supervising the residents who delivered plaintiff at his birth.

{¶ 21} In that case, Sandra Dee Mozingo was admitted to Pitt County Memorial Hospital on the afternoon of December 5, 1984, for the delivery of her second child, plaintiff Alton Ray Mozingo, Jr. At 5:00 p.m. that same day, defendant Dr. Richard John Kazior began his assignment to provide on-call coverage for the obstetrics residents at the hospital. Dr. Kazior remained at his home available to take telephone calls from the residents until shortly before 9:45 p.m., when he received a call from one of the residents informing him of a problem with the delivery of Alton. Dr. Kazior immediately left his home, but when he arrived at the hospital the delivery of Alton had already been completed.

{¶ 22} The plaintiffs in *Mozingo* (Alton and his father) claimed that Dr. Kazior had negligently supervised the residents who cared for Alton and his mother during his birth. However, there was no claim that Dr. Kazior was negligent in responding to the telephone call from the hospital or in anything he did or failed to do after receiving the call. Instead, the plaintiffs' claim for negligent supervision was based on what Dr. Kazior failed to do prior to receiving the request for assistance. Specifically, plaintiffs submitted the affidavit of a medical expert who stated that Dr. Kazior had a responsibility as the supervising physician to call the hospital at the beginning of his coverage shift to find out what obstetrical patients had been admitted, their condition, and to formulate a plan of management, and also to call periodically thereafter to check on their status. Since it was undisputed that prior to receiving the phone call, Dr. Kazior was never in direct contact with the patient, consulted by the treating residents, or in any way involved in the

patient's care, the issue presented in *Mozingo* is precisely the question confronting us in this case.

**{¶ 23}** In resolving this issue, the court in *Mozingo* explained:

"[W]e conclude that the defendant's duty of reasonable care in supervising the residents was not diminished by the fact that his relationship with the plaintiffs did not fit traditional notions of the doctor-patient relationship.

"The modern provision of medical care is a complex process becoming increasingly more complicated as medical technology advances. Large teaching hospitals, such as the Hospital in the present case, care for patients with teams of professionals, some of whom never actually come in contact with the treated patient but whose expertise is nevertheless vital to the treatment and recovery of patients.

"* * *

"Medical professionals may be held accountable when they undertake to care for a patient and their actions do not meet the standard of care for such actions as established by expert testimony. Thus, in the increasingly complex modern delivery of health care, a physician who undertakes to provide on-call supervision of residents actually treating a patient may be held accountable to that patient, if the physician negligently supervises those residents and such negligent supervision proximately causes the patient's injuries." (Citations omitted.) *Id.*, 331 N.C. at 188-189, 415 S.E.2d at 345.

**{¶ 24}** In *Maxwell v. Cole* (1984), 126 Misc.2d 597, 482 N.Y.S.2d 1000, the plaintiff, Diane Maxwell, entered New York Hospital in Manhattan for an elective tubal ligation. It was alleged that Maxwell's bladder was punctured during surgery and that the residents providing postoperative care failed to detect it. One of the defendants in the case was Dr. William Ledger, Chairman of the Department of Obstetrics and Gynecology at New York Hospital. Maxwell claimed that Dr. Ledger failed to adequately supervise the resident staff and to provide them with

standards as to the necessity in certain circumstances to seek prompt consultation with attending physicians.

{¶ 25} Dr. Ledger moved for summary judgment, arguing that since he did not render any medical care or treatment personally to Maxwell, there was no physician-patient relationship between them and he could not be held liable for her injuries. The court rejected "Dr. Ledger's narrow reading of a physician's responsibility," *id.*, 126 Misc.2d at 598, 482 N.Y.S.2d at 1001, and explained:

"In this case, it is claimed that the responsibility for supervision of the medical personnel lay in the hands of the chief of service, Dr. Ledger. With a broadened view of a hospital's role as a provider of health care services comes an expanded notion of its supervisory responsibilities over those who practice medical care on its premises. That supervisory responsibility, it is claimed was delegated to Dr. Ledger. If the chief of service fails to provide medically acceptable rules and regulations which would insure appropriate supervision of ill patients, then it is reasonable to find that a breach of the standards of medical care by that individual has occurred." (Citation omitted.) *Id.*, 126 Misc.2d at 599, 482 N.Y.S.2d at 1002.

{¶ 26} In *McCullough v. Hutzel Hosp.* (1979), 88 Mich.App. 235, 276 N.W.2d 569, the plaintiff, Ophelia McCullough, underwent a tubal ligation at Hutzel Hospital. Since Hutzel was a teaching hospital, the actual surgery was performed by a resident. The case proceeded to trial and the jury returned a verdict against certain defendant specialists in obstetrics and gynecology who undertook to supervise the resident.

{¶ 27} On appeal, the defendants challenged the admission of certain testimony given by plaintiffs' expert witness concerning the applicable standard of care. Defendants argued that because they did not actually perform the surgery, but were responsible only for supervising the resident who did, they were not engaged in the practice of their specialty and were not subject to a national standard of care

for their specialty. While this is a different aspect of the present issue, the following portion of the court's analysis is instructive:

"When plaintiff entered Hutzel Hospital for gynecological surgery, defendants assumed responsibility for her care. Even though the surgical procedure was actually performed by a resident, defendants were under a duty to see that it was performed properly. It is their skill and training as specialists which fits them for that task, and their advanced learning which enables them to judge the competency of the resident's performance. Their failure to take reasonable care in ascertaining that the surgery was competently performed renders them liable for the resulting damages. We reject defendants' argument that supervision of a patient's care does not constitute practice of medicine." (Footnote omitted.) *Id.*, 88 Mich.App. at 239, 276 N.W.2d at 571.

{¶ 28} In an amplifying footnote, the court pointed out that "defendants' liability is not predicated on the negligence of the resident, but upon their own negligence in failing to provide adequate supervision." *Id.* at 238, 276 N.W.2d at 571, fn. 1.

{¶ 29} The basic underlying concept in these cases is that a physician-patient relationship, and thus a duty of care, may arise from whatever circumstances evince the physician's consent to act for the patient's medical benefit. The physician-patient relationship being consensual in nature, these courts recognize that physicians who practice in the institutional environment may be found to have voluntarily assumed a duty of supervisory care pursuant to their contractual and employment arrangements with the hospital. Unlike the traditional personalized delivery of health care, where the patient seeks out and obtains the services of a particular physician, the institutional environment of large teaching hospitals incorporates a myriad of complex and attenuated relationships. Here the presenting patient enters a realm of full-service coordinated care in which technical agreements and affiliations proliferate the specialized functions and designated

10

obligations of various allied health professionals. In this reality, the responsibility for resident supervision that rests generally with the hospital is often delegated to or assumed by an individual physician or group of physicians. It is their level of skill and competence that ensures adequate patient care. When a patient enters this setting, he or she has every right to expect that the hospital and adjunct physicians will exercise reasonable care in fulfilling their respective assignments. So it is a logical and reasonable application of the principles set forth in *Tracy,* 58 Ohio St.3d 147, 569 N.E.2d 875, to find that a physician may agree in advance to the creation of a physician-patient relationship with the hospital's patients.

{¶ 30} According to Dr. Stover, however, the argument that a contract between a physician and hospital can be sufficient to form the basis for a physician-patient relationship was rejected in *Hill v. Kokosky* (1990), 186 Mich.App. 300, 463 N.W.2d 265, and *St. John v. Pope* (Tex.1995), 901 S.W.2d 420. We disagree. In neither case was any such argument raised, nor any evidence of a contract presented.

{¶ 31} In *Hill*, the issue was "[w]hether a physician-patient relationship arises from a treating physician's solicitation of a colleague's informal opinion on patient treatment." *Id*., 186 Mich.App. at 303, 463 N.W.2d at 266. The court stated, "In the absence of a referral, a formal consultation, or some other contractual relationship, * * * no physician-patient relationship arises in this context." *Id.*

{¶ 32} In *St. John*, the issue was "whether an on-call physician, consulted by an emergency room physician over the telephone, formed a physician-patient relationship by expressing his opinion that the patient be transferred to another facility." *Id.,* 901 S.W.2d at 421. Answering this question in the negative, the court explained:

"We do not dispute that a physician may agree in advance to the creation of a physician-patient relationship. For example, a physician's agreement with a hospital may leave the physician no discretion to decline treatment of the hospital's

clients. * * * If any agreement existed which divested St. John of the discretion to choose whether to treat a patient, it was incumbent on Pope to present it in order to preclude summary judgment for the doctor." *Id.* at 424.

{¶ 33} While these cases can be interpreted to indicate that consultation without contract is insufficient to establish a physician-patient relationship, it does not follow that contract without consultation is also insufficient to form the relationship. These are two distinct questions, and these cases simply have nothing to do with the latter issue.

{¶ 34} Dr. Stover also relies on *McKinney v. Schlatter* (1997), 118 Ohio App.3d 328, 692 N.E.2d 1045, and states in his brief the proposition that "direct contact and/or participation, or at the very least, knowledge regarding a patient, is necessary to establish a physician-patient relationship under any circumstances." On the other hand, appellants rely on *McKinney* for the proposition that "lack of contact between an on-call physician and an emergency room patient does not alone preclude the existence of a physician-patient relationship."

{¶ 35} In *McKinney*, an on-call consulting physician allegedly misdiagnosed the condition of an emergency room patient during two telephone conversations with the emergency room physician. It was undisputed that the on-call physician had no personal contact with the patient. The court held that a physician-patient relationship can be found to exist under these circumstances, provided that the on-call physician "(1) participates in the diagnosis of the patient's condition, (2) participates in or prescribes a course of treatment for the patient, and (3) owes a duty to the hospital, staff or patient for whose benefit he is on call." *Id.*, 118 Ohio App.3d at 336, 692 N.E.2d at 1050.

{¶ 36} We cannot agree with appellants' interpretation of *McKinney*. The court in *McKinney* did not hold that a physician-patient relationship can be created despite the lack of *any* contact between the physician and the patient. Instead, the court found that "the lack of *direct* contact between the patient and the on-call

12

physician does not, in itself, preclude a physician-patient relationship." (Emphasis added.) *Id.* at 336, 692 N.E.2d at 1050. However, when such personal contact is lacking, the *McKinney* test requires the plaintiff to show that the physician actually participated in the patient's care and was obligated to do so. In other words, even where an on-call physician is contractually obligated to perform the services at issue, the physician-patient relationship cannot be established unless it appears that the physician was actively involved in caring for the patient. *McKinney* does not support appellants' position.

{¶ 37} However, we now reject the *McKinney* test. In addition to the reasons stated above, we find that the test itself is incongruous, for it actually subsumes the ultimate question of duty. In order to satisfy what is merely the third of the three elements comprising the test, the plaintiff must prove the existence of the very duty that the test is ultimately designed to identify. Thus, even if a physician is shown to owe a duty of care to the patient, or to act for the patient's benefit, this duty is negated where the physician takes no affirmative action as provided in the other two elements of the test toward fulfilling his or her obligations. Simply put, the test allows a voluntarily assumed duty of care to be nullified by virtue of its very breach.

{¶ 38} Of course, the physician-patient relationship cannot come into being without the physician's consent. Otherwise, the physician would be forced to provide care to anyone who desired medical attention. But there are many forms of consent, and the three elements of the *McKinney* test are, in reality, a compilation of the various possible ways in which the physician's consent can be manifested. The physician may consent to the relationship by explicitly contracting with the patient, treating hospital, or treating physician. Or the physician may take certain actions that indicate knowing consent, such as examining, diagnosing, treating, or prescribing treatment for the patient. The *McKinney* test essentially takes the sum total of these various possible forms of consent and converts them into a set of

cumulative requirements. Consequently, the test requires not only proof of consent, actual or implied, but proof of consent in every conceivable form.

{¶ 39} Under the *McKinney* test, as applied in the present context, a physician who explicitly accepts or voluntarily assumes the obligation to provide resident supervision, knowing full well that the fulfillment of these supervisory duties is vital to the interests of the hospital's patients, could escape his or her obligation simply by failing to provide any supervision at all. We find such a rigid, formalistic notion of consent to be both unrealistic and unjustified.

{¶ 40} Accordingly, we hold that a physician-patient relationship can be established between a physician who contracts, agrees, undertakes, or otherwise assumes the obligation to provide resident supervision at a teaching hospital and a hospital patient with whom the physician had no direct or indirect contact.

{¶ 41} This holding does not, however, end the inquiry in this case, but instead brings the pivotal issue into focus. As explained by the dissenting justice in *Mozingo, supra*:

"The mere existence of such an agreement [delegating the responsibility of supervision] does not, however, end the inquiry of determining who has responsibility for supervision. As with the delegation of all duties, the terms of the agreement between the delegator and the delegatee control. The delegatee will be charged only with the duties that he has voluntarily assumed." *Id.*, 331 N.C. at 194, 415 S.E.2d at 348 (Meyer, J., dissenting).

{¶ 42} While disagreeing with the dissent as to its application, the majority in *Mozingo* also recognized "the general principle that a physician may contractually limit the extent and scope of his employment." *Id.* at 191, 415 S.E.2d at 346.

{¶ 43} Similarly, although the court in *Maxwell,* 126 Misc.2d 597, 482 N.Y.S.2d 1000, held that a hospital may delegate its supervisory responsibilities to

a particular physician, it did not determine whether such a delegation had occurred. Instead, the court concluded:

"Accordingly, summary judgment is at this time inappropriate. There needs to be full discovery to ascertain whether, in fact, Dr. Ledger was designated to carry out the duties and responsibilities claimed for him * * *. If those supervisory responsibilities are demonstrated to be beyond his actual grant of power, then it would be appropriate for Dr. Ledger to renew his motion." *Id.*, 126 Misc.2d at 599, 482 N.Y.S.2d at 1002.

{¶ 44} Thus, the determinative issue in this case is not whether Dr. Stover had any contact with Lownsbury or the residents treating her, but whether and to what extent Dr. Stover assumed the obligation to supervise the residents at Akron City Hospital. Specifically, did Dr. Stover assume only a limited and passive duty to remain in his call room until consulted by a resident with a problem, or did he assume an active duty to gauge the performance of the residents or familiarize himself with the condition of the patients at Akron City Hospital?

{¶ 45} Having reviewed the entire record in this case, including the EMS-ACH contract, the consent form signed by Lownsbury, the agreement between Dr. Stover and EMS, and the various affidavits and depositions given by appellants' experts, EMS physicians and hospital residents, we conclude that there is sufficient evidence upon which the jury could decide this question either way. In so doing, we are aware that the EMS physicians and hospital residents testified that Dr. Stover had no responsibility to a hospital patient unless and until he was contacted by a resident. However, this testimony is disputed by the consent form and the testimony of appellants' experts.

{¶ 46} Although it is not clear, as Dr. Stover points out, whether Lownsbury signed the consent form on January 6 or January 10, 1995, that form nevertheless establishes that Akron City Hospital considers the supervisory physician to be the patient's "attending physician" and expects that patient services will be ordered by

or rendered under the general and specific instructions of such physician. Therefore, the consent form constitutes substantial evidence that Dr. Stover was required to take an active role in supervising the hospital's residents and caring for the hospital's patients. See *Fenley [sic, Fence] v. Hospice in the Pines* (Tex.App.1999), 4 S.W.3d 476, 480.

**{¶ 47}** Also, we disagree with the court of appeals that the testimony of appellants' experts confined itself to whether Dr. Stover breached the standard of care. Instead, as indicated above, these experts specifically testified as to the existence and nature of Dr. Stover's duties on January 6, 1995.

**{¶ 48}** We are also aware that the "RECITALS" portion of the EMS-ACH contract indicates that one of its objectives is to provide "for the ready availability of PHYSICIANS for the purpose of resident supervision." However, we cannot agree with Dr. Stover that this statement necessarily allows him to avoid all contact and communication with the resident staff except when consulted, or that it places the decision as to when supervision is needed into the hands of those who need to be supervised.

**{¶ 49}** Despite Dr. Stover's repeated reference to EMS physicians as "on-call obstetricians," nowhere in any of the agreements in this case is such a designation to be found. Indeed, the phrase "ready availability" is itself susceptible of differing interpretations. "Available" can mean "accessible" or "obtainable," but it is also defined as "qualified or willing * * * to assume a responsibility." Merriam-Webster's Collegiate Dictionary (10 Ed.2000) 79. In turn, "supervision" means "*esp.*: a critical watching and directing (as of activities or a course of action)." *Id.* at 1180. Considering that the phrase appears in the context of a clause that obligates EMS to provide continuous, around-the-clock on-premises resident supervision, it is reasonable to interpret "ready availability" to mean that EMS physicians must be willing to assume the responsibility to watch and direct the residents at Akron City Hospital. Moreover, this phrase is conspicuously omitted from the actual

16

"AGREEMENTS" portion of the EMS-ACH contract, which provides simply that EMS is to "provide SERVICES on HOSPITAL premises twenty-four (24) hours per day, seven (7) days per week" and "insure [that] high quality professional medical care will be provided to HOSPITAL'S obstetrical and gynecological patients."

{¶ 50} In light of all the foregoing, we hold that appellants presented sufficient evidence to raise a genuine issue of material fact as to whether a physician-patient relationship existed between Dr. Stover and Lownsbury on January 6, 1995.

{¶ 51} Accordingly, we find that summary judgment was inappropriately granted in favor of Dr. Stover, and the judgment of the court of appeals is hereby reversed. The cause, therefore, is remanded to the trial court for further proceedings.

*Judgment reversed*
*and cause remanded.*

DOUGLAS, F.E. SWEENEY and PFEIFER, JJ., concur.

MOYER, C.J., COOK and LUNDBERG STRATTON, JJ., concur separately in syllabus and judgment.

————————————

**MOYER, C.J., concurring in syllabus and judgment.**

{¶ 52} I concur only in the syllabus and judgment.

————————————

**COOK, J., concurring in syllabus and judgment only.**

**{¶ 53}** The existence of a legal duty in ordinary negligence cases is generally a question of law for the court. *Mussivand v. David* (1989), 45 Ohio St.3d 314, 318, 544 N.E.2d 265, 270. Similarly, the question of whether there exists a physician-patient relationship—upon which the legal duty in medical malpractice cases is predicated—is a legal issue that a court must decide before the factfinder decides what the appropriate standard of care was in a given case. *St. John v. Pope* (Tex.1995), 901 S.W.2d 420, 424. It does not necessarily follow, however, that the court may always decide at the summary-judgment stage the existence or nonexistence of a physician-patient relationship as a matter of law. There are some circumstances in which "the existence of a duty may depend on preliminary questions that must be determined by a fact finder." *Diggs v. Arizona Cardiologists, Ltd.* (Ariz.App.2000), 198 Ariz. 198, 200, 8 P.3d 386, 388. Such is the case in the medical-malpractice context, where the existence of a physician-patient relationship may depend on the facts of the particular case and essentially become a question for the trier of fact. See *Irvin v. Smith* (Kan.2001), 31 P.3d 934, 940-941; *Gallion v. Woytassek* (1993), 244 Neb. 15, 20, 504 N.W.2d 76, 80; *Eby v. Newcombe* (1989), 116 Idaho 838, 840, 780 P.2d 589, 591; *Lyons v. Grether* (1977), 218 Va. 630, 633, 239 S.E.2d 103, 105.

**{¶ 54}** In this case, the consent form signed by Cathy Lownsbury, the contract between East Market and Akron City Hospital, and the contract between Dr. Stover and East Market raise a genuine issue of material fact concerning the existence of a physician-patient relationship. Accordingly, I concur in the court's syllabus and judgment.

———————————

**LUNDBERG STRATTON, J., concurring in syllabus and judgment only.**

**{¶ 55}** I join Justice Cook's concurrence but also write to state that once we determined that issues of fact existed, our duty ended. The majority, however, goes

on to comment on and evaluate the disputed evidence. That is not our role in this case and is unnecessary to the disposition of this case. Having sent the matter back to the trier of fact, we should refrain from possible prejudicial comments regarding those facts. Therefore, I respectfully concur in the syllabus and judgment only.

_____

*Sandra J. Rosenthal; Muth & Shapiro, P.C.,* and *Andrew S. Muth; Beam & Associates* and *Jack Beam*; *Alpert, D'Anniballe & Visnic* and *Robert D'Anniballe, Jr.*, for appellants.

*Reminger & Reminger Co., L.P.A., Thomas Mannion* and *James M. Kelley III*, for appellee Thomas D. Stover, M.D.

*Zavarello & Davis Co., L.P.A., A. William Zavarello* and *Rhonda Gail Davis*, urging reversal for *amicus curiae*, Ohio Academy of Trial Lawyers.

_____