JOURNAL ENTRY AND OPINION
{¶ 1} Patricia L. Wazevich ("Wazevich"), administratrix of the estate of William D. Wazevich ("decedent") appeals from the decision of the trial court granting summary judgment in favor of James L. Tasse, M.D. ("Doctor Tasse"). Wazevich argues the trial court erred when it determined that no physician-patient relationship existed between the decedent and Doctor Tasse, and that all claims against Doctor *Page 3 
Tasse had been released in a previous settlement agreement. For the following reasons, we reverse the decision of the trial court.
 {¶ 2} This case arose from the death of the decedent, a fifty-three-year-old man who bled to death from a stomach ulcer while awaiting treatment in Southwest General Hospital ("SWGH"). At approximately midnight on February 21, 2002, the decedent arrived at SWGH with signs of upper gastrointestinal bleeding, including vomiting blood. SWGH admitted the decedent into the emergency room with the diagnosis of "acute GI bleed."
 {¶ 3} SWGH staff transferred the decedent to the coronary care unit and contacted Doctor Adnan Raed, ("Doctor Raed") a gastroenterologist. Doctor Raed accepted the decedent as his patient and performed an endoscopic procedure at approximately 5:00 a.m. Doctor Raed found a very large blood clot in the patient's stomach but could not determine what was behind the clot. He also found a site with a smaller clot that he believed was a source of the bleeding. Doctor Raed treated that site and believed he had stopped the decedent's bleeding. Doctor Raed wanted a general surgeon assigned to the decedent, in case the patient continued to bleed.
 {¶ 4} During the time that the decedent was in the critical care unit, Doctor Tasse was completing a twenty-four-hour shift as the surgical intensivist on duty for SWGH. Southwest Medical Care Corporation ("SMCC") employed the physicians who staffed the intensive care unit of SWGH, and Doctor Tasse worked as an employee of SMCC as a surgical intensivist. A surgical intensivist on duty was *Page 4 
obligated to provide urgent, emergent and limited routine care to critically ill patients, in the absence of a patient's attending physician. SWGH's policy directly forbids a surgical intensivist from actually performing surgery and from accepting private consults while on shift.
 {¶ 5} At 5:15 a.m., when Doctor Raed was looking for a backup surgeon to monitor the decedent, Doctor Tasse told a nurse that because he was on shift as a surgical intensivist, he could not serve as the surgical back up. Doctor Tasse suggested the nurse contact Doctor Patricia Galloway, a surgeon ("Doctor Galloway"). Doctor Raed contacted Doctor Galloway and reported the results of the decedent's endoscopic procedure. Doctor Galloway spoke directly to Doctor Raed at approximately 5:30 a.m. and agreed to act as the decedent's surgeon and to come in and evaluate him later that same day. Doctor Galloway then traveled to Medina General Hospital to perform scheduled surgeries.
 {¶ 6} However, almost immediately thereafter, the decedent began to show signs of ongoing bleeding. At approximately 7:00 a.m., with Doctor Galloway and Doctor Raed away from the hospital, the critical care nurses called for Doctor Tasse, the surgical intensivist, to evaluate the decedent. Doctor Tasse evaluated the patient and ordered that more blood be given. One-half hour later, the patient began deteriorating. The nurses contacted Doctor Galloway at Medina General Hospital. Doctor Galloway told the nurses to consult Doctor Tasse because she was far away and preparing to do surgery on another patient. *Page 5 
 {¶ 7} At approximately 8:00 a.m. to 8:03 a.m.,[1] Doctor Galloway spoke with Doctor Tasse, who stated that he would not be able to take the decedent as a patient because he was leaving town. However at that time, Doctor Tasse's shift as the surgical intensivist had ended and he had just begun a shift as the emergency room on-call surgeon. Doctor Galloway eventually contacted Doctor Lucius Gliga ("Doctor Gliga"), who agreed to come see the decedent within what Doctor Galloway felt was a reasonable time frame. Doctor Tasse left the hospital at approximately 8:30 a.m.
 {¶ 8} At approximately 11:00 a.m., the decedent suffered cardiac arrest from massive internal bleeding. He was pronounced dead at 11:37 a.m. The decedent never received surgery to repair the bleeding ulcer.
 {¶ 9} In October 2002, Wazevich filed a wrongful death and survivorship action against SWGH and three of its staff physicians who treated the deceased: Doctor Raed, Doctor Gliga and Doctor Galloway. Wazevich later amended her complaint to add claims against Southwest Medical Care Corporation ("SMCC"), Doctor Tasse, and Doctor Dilip Narichania.
 {¶ 10} Just shy of the September 7, 2005 trial, Wazevich settled her claims with all defendants except Doctor Tasse and Doctor Galloway and then voluntarily *Page 6 
dismissed the claims against these two doctors.[2] On September 28, 2005, Wazevich refiled the instant action.
 {¶ 11} In her refiled complaint, Wazevich did not attack Doctor Tasse's actions as the surgical intensivist, which had been settled in the previously filed case. Wazevich's claim was based on Doctor Tasse's actions as the emergency room on-call surgeon. Specifically, Wazevich claimed that because Doctor Tasse was the on-call surgeon for the SWGH emergency room, he de facto accepted, or consented to act on behalf of the deceased. Therefore, Doctor Tasse was negligent in his failure to ensure that the deceased received proper surgical care, ultimately resulting in his untimely death.
 {¶ 12} Doctor Tasse disagreed and argued that under Ohio law, he was not obligated to accept the decedent as his patient, that his status as the emergency room on-call surgeon did not create a duty to treat a patient in the cardiac care unit, and that another surgeon eventually accepted responsibility for the deceased's care. Additionally, Doctor Tasse claimed that Wazevich's previous settlement with SMCC released any further claim against him because Wazevich's expert could not distinguish the criticisms of Doctor Tasse as a surgical intensivist and Doctor Tasse as the on-call surgeon. In particular, Doctor Tasse argued that because Wazevich released his claims against him as a surgical intensivist, Wazevich's expert's *Page 7 
opinions, which could not distinguish between intensivist and on-call surgeon, were barred and her case failed as a matter of law.
 {¶ 13} On August 4, 2006, Doctor Tasse filed a motion for leave to file a motion for summary judgment and a motion to file an exhibit under seal.[3] On September 19, 2006, the trial court granted Doctor Tasse's motions and ordered Wazevich to file a brief in opposition to the motion for summary judgment. On October 6, 2006, the trial court granted Doctor Tasse's motion for summary judgment. In doing so, the trial court issued the following order:
 {¶ 14} "This cause comes on for consideration on defendant JamesTasse, M.D.'s motion for summary judgment, filed 8/04/06. This courtfinds that defendant Dr. Tasse owed no legal duty to assume the surgicalcare of the decedent and that all claims against Dr. Tasse asintensivist have been resolved in the previously filed case, theevidence for which was received by this court under seal. Moreover,plaintiff's expert is unable to offer criticism of Dr. Tasse's role inthe decedent's treatment, except his acts as an intensivist, which claimhas already been released. Therefore, this court finds that thereremains no genuine issue of material fact and that reasonable mindscould only conclude that the defendant, James Tasse, M.D., is entitledto judgment as a matter of law. The court finds defendant's motionwell-taken and is therefore granted. There is no just cause for delay.Partial."
 {¶ 15} Wazevich appeals from this grant of summary judgment.
 {¶ 16} We review an appeal from summary judgment under a de novo standard of review. Baiko v. Mays (2000), 140 Ohio App.3d 1. Accordingly, we afford no *Page 8 
deference to the trial court's decision and independently review the record to determine whether summary judgment is appropriate. Id.;Brown v. Cty. Commrs. of Scioto Cty. (1993), 87 Ohio App.3d 704. Pursuant to Civ.R. 56, summary judgment is appropriate when: (1) no genuine issues as to any material fact exist, (2) the party moving for summary judgment is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can reach only one conclusion that is adverse to the nonmoving party. Temple v. Wean United, Inc. (1977), 50 Ohio St.2d 317.
 {¶ 17} The moving party carries an initial burden of setting forth specific facts that demonstrate his or her entitlement to summary judgment. Dresher v. Burt, 75 Ohio St.3d 280, 292-293, 1996-Ohio-107. If the movant fails to meet this burden, summary judgment is not appropriate; if the movant does meet this burden, summary judgment will be appropriate only if the nonmovant fails to establish the existence of a genuine issue of material fact. Id. at 293.
 {¶ 18} In her first assignment of error, Wazevich argues as follows:
 {¶ 19} "The trial court erroneously decided material issues of factabout whether Dr. Tasse, in his role as private surgeon, had aphysician-patient relationship and attendant legal duty to thepatient."
 {¶ 20} The existence of a duty is an essential element of proof in a medical malpractice claim. Littleton v. Good Samaritan Hosp. HealthCtr (1988), 39 Ohio St.3d 86, 92; Lownsbury v. VanBuren,94 Ohio St.3d 241, 2002-Ohio-646. In turn, the duty of care owed by a physician is predicated on the existence of a physician- *Page 9 
patient relationship. Lownsbury, supra. In Tracy v. Merrell DowPharmaceuticals, Inc. (1991), 58 Ohio St.3d 147, 150, the Ohio Supreme Court explained:
 {¶ 21} "The physician-patient relationship arises out of an express orimplied contract which imposes on the physician an obligation to utilizethe requisite degree of care and skill during the course of therelationship. The relationship is a consensual one and is created whenthe physician performs professional services which another personaccepts for the purpose of medical treatment.
 {¶ 22} "The physician-patient relationship is a fiduciary one based ontrust and confidence and obligating the physician to exercise goodfaith. As a part of this relationship, both parties envision that thepatient will rely on the judgment and expertise of the physician. Therelationship is predicated on the proposition that the patient seeks outand obtains the physician's services because the physician possessesspecial knowledge and skill in diagnosing and treating diseases andinjuries which the patient lacks." (Citations omitted.)"Lownsbury, supra.
 {¶ 23} In putting forth his argument that no physician-patient relationship existed between himself and the decedent, Doctor Tasse argues that he did not agree to assume the burden of the decedent's surgical case, as was his right under Ohio law. Doctor Tasse cites to the principle in Ohio law that establishes that the physician-patient relationship is one of voluntary mutual consent. Lownsbury, supra. Doctor Tasse argues that because he declined to take over the decedent's case when requested by Doctor Galloway, he took no affirmative action with regard to the decedent's treatment and, therefore, no physician-patient relationship can be established. *Page 10 
 {¶ 24} Doctor Tasse also preemptively distinguishes the instant case from the Ohio Supreme Court decision of Lownsbury. InLownsbury, the Ohio Supreme Court held that "a physician-patient relationship can be established between a physician who contracts, agrees, undertakes, or otherwise assumes the obligation to provide resident supervision at a teaching hospital and a hospital patient with whom the physician had no direct or indirect contact." Doctor Tasse points out that unlike the Lownsbury case, the instant case does not involve either a supervisory physician nor care involving hospital residents. Therefore, according to Doctor Tasse, Wazevich cannot make a connection between the Lownsbury legal analysis pertaining to a supervisory physician and the role of Doctor Tasse as an on-call emergency room surgeon.
 {¶ 25} Doctor Tasse further argues that his status as the emergency room on-call surgeon at 8:00 a.m. on the morning of February 21, 2002, is a red herring. According to Doctor Tasse, SWGH's staff rules "clearly" defined on-call responsibilities as being limited to emergency room patients who did not have assigned surgeons. Doctor Tasse claims that because the decedent was located in the cardiac care unit, not in the emergency room, his status as the on-call surgeon did not obligate him to take over the decedent's care.
 {¶ 26} Doctor Tasse argues that he was not required to take the decedent's case and that after he refused care to the decedent, Doctor Galloway was able to obtain Doctor Gliga's acceptance of the case. Doctor Tasse states that what Doctor *Page 11 
Gliga "did or did not do after he accepted the case and evaluated Mr. Wazevich as the responsible surgeon was previously resolved by Appellant via settlement."
 {¶ 27} Without taking into consideration any argument raised by Wazevich, this court still finds that it is unclear whether Doctor Tasse maintained a physician-patient relationship with the decedent. Accordingly, we cannot say that Doctor Tasse met his burden of proof to warrant the grant of summary judgment. Nonetheless, we shall look further into the record.
 {¶ 28} In response to Doctor Tasse's claims, Wazevich argues that Doctor Tasse, in his role as a general surgeon, had a cognizable physician-patient relationship with the decedent. In support of this argument, Wazevich cites to Lownsbury, which, although distinguishable from the instant case, does provide guidance for this court in determining whether a physician-patient relationship exists.
 {¶ 29} In Lownsbury, the Ohio Supreme Court held that "a physician-patient relationship, and thus a duty of care, may arise from whatever circumstances evince the physician's consent to act for the patient's medical benefit." There are many forms of consent in this context. Id. A doctor who "contracts, agrees, undertakes or otherwise assumes" an obligation to care for a class or type of hospital patient can have a relationship and corresponding duty, even if he never sees the patient at issue. Id.
 {¶ 30} Here, the record reveals that Doctor Tasse consented to act as the emergency room on-call surgeon starting at 8:00 a.m. on February 21, 2002. Prior to *Page 12 
that time, Doctor Tasse had already treated and evaluated the decedent as the surgical intensivist, thereby creating a physician-patient relationship with the decedent, at least for the time he was acting as the surgical intensivist. However, at 8:03 a.m., when Doctor Galloway requested a consult from Doctor Tasse, the now on-call surgeon for the emergency room, he declined to treat the decedent, because he was "going out of town." Nonetheless, Doctor Tasse did speak with Doctor Galloway about the decedent's case, provided her with an update on his status, and facilitated the acquisition of another surgeon to take over the case, all after his shift as the surgical intensivist ended.
 {¶ 31} Doctor Tasse cited to a medical staff rule that addressed generally the obligation of all types of specialists to take emergency calls. But, this rule did not define or apply the specific obligations of emergency calls for surgeons. In fact, the deposition testimony of Doctor Dilip Narichania reveals that the general surgeon on call must be available to accept surgical consults and that this obligation was not limited to consults on patients in the emergency room.
 {¶ 32} "Q: If the call comes from the emergency room regarding apatient who's in the emergency room, you are obligated to take thepatient because you're on call then?
 {¶ 33} "A: That is correct.
 {¶ 34} "Q: You must either take the patient or have coverage?
 {¶ 35} "A: That is true. *Page 13 
 {¶ 36} "Q: Now, by virtue of this call that we're talking about, ifyou are called by an attending physician about a patient in a criticalcare unit and he or she is asking you to see a patient who needssurgical consult, are you obligated, as you understand it, to acceptthat call and see that patient?
 {¶ 37} "A: Usually the way it works is that the physician will callyou from the floor, either the ICU or a regular floor, and he will tellyou that I'm calling you since you are on emergency room call, so it isusually a physician-to-physician conversation.
 {¶ 38} "Q: So if that happens, physician to physician, and you're told`I'm calling you because you're on emergency room call' do you then haveto assist that doctor?
 {¶ 39} "A: Yes, sir.
 {¶ 40} "Q: All right. So does it change if a nurse calls instead of aphysician?
 {¶ 41} "A: Usually the nurse calls, says `We're calling you becauseyou're on emergency room call.'
 {¶ 42} "Q: And if they say that to you about a patient in a criticalcare unit, you are obligated to take that patient if you're oncall?
 {¶ 43} "A: Yes, sir."
 {¶ 44} It is clear from the record outlined above, that even if Doctor Tasse met his burden on summary judgment, Wazevich met her reciprocal burden of establishing the existence of genuine issues of material fact.
 {¶ 45} Once again, although distinguishable, the Lownsbury case must be considered by this court before reaching a conclusion. The Ohio Supreme Court, *Page 14 
after conducting a thorough review of the case law from its own and other jurisdictions, determined that a physician-patient relationship could be established between a supervisory physician and the patient, even though the supervisory physician never had contact with the patient. This case, although distinguishable in some ways, is even stronger than Lownsbury in others. Most importantly, Doctor Tasse treated and evaluated the decedent prior to his 8:00 a.m. shift as the emergency room on-call surgeon. Additionally, Doctor Tasse advised Doctor Galloway of the decedent's status after his shift as the on-call doctor began. Doctor Tasse's own notes reveal that he "facilitated" Doctor Galloway in finding another surgeon to see the decedent and that when he left the hospital, the decedent was stable.
 {¶ 46} Although Doctor Tasse did state that he would not take the patient, genuine issues of material fact remain to be litigated about whether a physician-patient relationship existed. Specifically, did SWGH's emergency room on-call procedures forbid Doctor Tasse from taking over care of a patient in the cardiac care unit, and did Doctor Tasse affirmatively take action on behalf of the decedent, when he spoke with Doctor Galloway after 8:00 a.m. on February 21, 2002?
 {¶ 47} We note that although Doctor Tasse claims the question of whether a legal duty existed is a question of law to be determined by the trial court, we conclude that the legal issue of whether a duty is owed arises from the existence of a physician-patient relationship.Littleton, supra. The question of whether a physician- *Page 15 
patient relationship exists is a very fact and case specific inquiry and depends upon preliminary questions of fact that must be determined by the fact finder. Lownsbury, supra.
 {¶ 48} Accordingly, we conclude that Wazevich presented sufficient evidence to raise genuine issues of material fact as to whether a physician-patient relationship existed between Doctor Tasse and the decedent on February 21, 2002.
 {¶ 49} We sustain Wazevich's first assignment of error.
 {¶ 50} In her second assignment of error, Wazevich argues as follows:
 {¶ 51} "The trial court erroneously concluded that all claims againstDr. Tasse were released in a settlement with the corporation thatemployed him while he worked his shift as a surgical intensivist."
 {¶ 52} This court has carefully reviewed the settlement agreement entered into between SMCC and Wazevich, which was filed under seal, and concludes the agreement does not bar Wazevich's claims against Doctor Tasse as a general surgeon.
 {¶ 53} The agreement is titled "Covenant Not To Sue and To Cease Suing And Indemnity Agreement (Partial Compensation with Express Reservation of Rights)." The agreement defined the settled claims as the surgical intensivist's claims and expressly omitted from its scope the general surgery claims. Additionally, the document clearly states that the private general surgery claims shall remain pending against Doctor Tasse and that Wazevich will restrict at trial her experts' opinions to the general surgery claims against Doctor Tasse individually. *Page 16 
 {¶ 54} A covenant not to sue is nothing more or less than a contract and should be so construed. Diamond v. Davis Bakery, Inc. (1966),8 Ohio St.2d 38. The covenant in the instant case is consistent with sound public policy; it encourages the settlement of controversies and litigation. Here, Wazevich decided to cease and desist in her pursuit against SMCC, the employer of SWGH's surgical intensivists. Wazevich received compensation in exchange for the cease and desist and the parties memorialized the agreement. The agreement clearly reflects the parties' understanding that this settlement amount was a partial settlement and that Wazevich intended to pursue a claim against Doctor Tasse in his role as a general surgeon.
 {¶ 55} Doctor Tasse does not dispute that the covenant not to sue carefully sculpted out his actions as a general surgeon. He does however, argue that Wazevich's expert cannot distinguish between criticisms of Doctor Tasse as an intensivist and Doctor Tasse as a general surgeon. Accordingly, because of the covenant's own language that restricts Wazevich's experts' opinions to the general surgery claims against him, Doctor Tasse states that Wazevich cannot make a claim for medical malpractice. In support of this argument, Doctor Tasse cites to the following passage in Wazevich's expert's testimony:
 {¶ 56} "I have criticisms of Dr. Tasse, which specifically relate tohis conduct in this case. And as I mentioned, the care blends from hisrole as intensivist to non intensivist. My concerns are most in regardto when he left the patient and the fact that he didn't take the patientto the operating room when I felt that the patient should have gone tothe *Page 17 operating room. But that care blended from the time he first saw thepatient at 7:25 up until the time he left at approximately, 8:30. It'shard for me to parse out * * *."
 {¶ 57} While this passage does seem to suggest that Wazevich's expert cannot distinguish Doctor Tasse's alleged negligent conduct between intensivist and non-intensivist, other evidence in the record reveals the expert's direct criticisms of Doctor Tasse's behavior as a general surgeon.
 {¶ 58} Wazevich's expert report concluded that the care rendered by the defendants, including Doctor Tasse, "fails to meet the appropriate and acceptable standards of care and led directly to [the patient's] demise." When specifically discussing Doctor Tasse, the expert's report stated:
 {¶ 59} "He abandoned Mr. Wazevich in an extremely unstable condition.His argument that he was a surgical intensivist and could not getinvolved in a private consultation was moot when he went off`intensivist' call at 0800. Additionally, he was `on call' for surgicalemergencies at Southwest General Health Center as of 0800."
 {¶ 60} The expert report also criticizes Doctor Tasse's classification of the decedent as "stable" when talking with Doctor Galloway at 8:03 a.m. on February 21, 2002. The expert report concluded that the decedent was not stable at this time.
 {¶ 61} We conclude that Wazevich's expert report specifically criticizes Doctor Tasse's actions as a general surgeon. Accordingly, these portions of the expert's report should be admitted to support plaintiff's claim of medical negligence against Doctor Tasse. *Page 18 
 {¶ 62} We therefore find that Wazevich is not barred from presenting those portions of her expert report, which specifically criticize Doctor Tasse's actions as a general surgeon. The covenant not to sue executed between SMCC and Wazevich specifically excluded any claim against Doctor Tasse as a general surgeon. We therefore disagree with the trial court's conclusion that all claims against Doctor Tasse were resolved by settlement.
 {¶ 63} We sustain Wazevich's second assignment of error.
 {¶ 64} We reverse the judgment of the trial court and remand for proceedings consistent with this opinion.
It is ordered that appellant recover from appellee costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
FRANK D. CELEBREZZE, JR., A.J., and ANN DYKE, J., CONCUR.
[1] Doctor Tasse argues that Doctor Galloway sought another surgeon at 8:00 a.m., while Wazevich argues that Doctor Galloway sought another surgeon at 8:03 a.m. Doctor Tasse's shift as the surgical intensivist ended at 8:00 a.m., and he immediately began a shift as the emergency room on-call surgeon.
[2] SMCC, the employer of the intensivists, including Doctor Tasse, elected to settle differences with Wazevich as to the corporation and its employees.
[3] Doctor Tasse sought to introduce, under seal, the settlement agreement executed between Wazevich and SMCC, who settled on behalf of its employees, the surgical intensivists. *Page 1