[Cite as *Evans v. Toledo Neurological Assocs.*, 2014-Ohio-4336.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY


Richard E. Evans, Jr., et al.                    Court of Appeals No. L-13-1227

     Appellants                              Trial Court No. CI0201106112

v.

Toledo Neurological Associates, et al.           **DECISION AND JUDGMENT**

     Appellees                               Decided:  September 26, 2014

* * * * *

Dennis J. Bartek, Natalie M. Niese, and William R. Ahern, for appellants.

Jeanne M. Mullin for appellees, Mark Loomus, M.D., and Toledo
Neurological Associates.

Gayle K. Beier and Stephen A. Skiver for appellees, David Szczesniak, M.D.,
and X-Ray Associates, Inc.

* * * * *

**JENSEN, J.**

{¶ 1} Following jury verdicts in favor of defendants-appellees Mark Loomus,

M.D., Toledo Neurological Associates, Inc., David Szczesniak, M.D., and Advanced

Radiologic Physicians, Inc., plaintiffs-appellants, Richard and Patricia Evans, appeal the September 13 and October 3, 2013 judgments of the Lucas County Court of Common Pleas. For the reasons that follow, we affirm, in part, and reverse, in part.

## A. Background

{¶ 2} Around 5:30 a.m. on the morning of August 11, 2008, Richard Evans,[1] then 54 years old, began experiencing chest pain, dizziness, shortness of breath, and blurred vision. He believed he was having a heart attack and that he was going to die. His wife, Patricia Evans, called 9-1-1 and he was taken by ambulance to the emergency department ("E.D.") at St. Luke's Hospital. His chest pain resolved before arriving in the E.D., but he developed neck pain and nausea while en route. In the E.D., he developed a headache for which he was given Tylenol. He was given Zofran for nausea and Demerol and Phenergan for intermittent chest pain. Although preliminary testing did not reveal that he had suffered cardiac trauma, he was admitted to St. Luke's for a cardiac catheterization and additional monitoring. The E.D. physician's diagnosis was chest pain and unstable angina.

{¶ 3} During Evans' hospital stay, his primary complaints became his headache, neck pain, nausea, and vomiting. He thought perhaps the neck pain resulted from tension caused by the panic he experienced during that morning's events. He underwent the cardiac catheterization which revealed no indication that he had experienced a heart attack. Cervical x-rays were also performed which showed no injury to his neck. His

---

[1] Although Mrs. Evans is also a party to this case, we will, for the most part, refer to Evans singularly.

2.

symptoms persisted, however, and on August 13, 2008, the nurses' notes reflect that he had a "severe headache stated states [sic] feels like a vise and going to pop off if doesn't get something quickly." His treating physician was notified and he ordered an MRI of Evans' head, as well as a neurology consult. Neither order was issued "stat," which means that the ordering physician assigned no particular urgency to the orders.

{¶ 4} The order for the MRI indicated a history of migraines and extreme headaches. Dr. Szczesniak, a neuroradiologist, reviewed the images from the MRI and found "no intracranial bleed." He found only "mild chronic changes related to aging." Dr. Loomus, a neurologist, examined Evans on August 14, 2008. Although he viewed the images from the MRI, he had also read Dr. Szczesniak's report indicating that the MRI was essentially normal.

{¶ 5} Evans explained to Dr. Loomus that he initially sought emergency medical services due to chest pain but that by the time he arrived at the E.D., his chief complaint was his headache and neck pain. Evans told Dr. Loomus that the headache persisted but had not gotten better or worse. He said that muscle relaxants helped with his neck pain but he was experiencing nausea. He also informed Dr. Loomus that he had been experiencing insomnia for approximately a week; he underwent hand surgery the week before and it was causing him pain. During Dr. Loomus' physical examination, he turned Evans' neck to the left. Evans "winced" but said it did not hurt him. Dr. Loomus noted that Evans was "alert and oriented with normal speech and language function," he demonstrated no aphasia or dysarthria, his sensation was intact, his fine motor

3.

movements were normal, and his strength was 5/5. His impression was that Evans was experiencing cervicogenic headaches, cervical strain, insomnia, possible carpal tunnel syndrome, and minimal degenerative disc disease. Dr. Loomus also noted that Evans was a tobacco user and that his brain MRI was normal.

{¶ 6} Evans was ultimately discharged on August 15, 2008. His symptoms never completely resolved, although the intensity of his pain fluctuated. Once home, his pain began to subside but eventually returned. On August 26, 2008, his wife observed that Evans could not put words together, was disoriented, and did not seem himself. She took him to Wood County Hospital's E.D. where a CT was performed. It revealed that Evans had suffered a subarachnoid hemorrhage that was worrisome for an aneurysm. He was life-flighted to St. Vincent Hospital where a cerebral arteriogram confirmed the presence of a one-centimeter berry aneurysm. He was transported by ambulance to University Hospital in Cleveland. Doctors there performed a coiling procedure. Evans was left with neurologic deficits, though the severity of those deficits is disputed by the parties.

{¶ 7} On August 21, 2009, Evans and his wife filed a complaint against Dr. Loomus, his employer, Toledo Neurological Associates, Inc., Dr. Szczesniak, his employer, Advanced Radiologic Physicians, Inc., and St. Luke's Hospital, claiming medical negligence, loss of chance, and loss of consortium. They dismissed St. Luke's on May 16, 2011, voluntarily dismissed their complaint on July 7, 2011, against the remaining defendants under Civ.R. 41(A), and refiled the present suit on October 20, 2011. The case proceeded to trial on August 26, 2013, and lasted seven days.

4.

{¶ 8} The trial court excused Evans' appearance at trial. The preceding facts were established primarily through the testimony of his wife and from the medical records. In addition to Mrs. Evans, Evans' two adult children testified, as did Lawrence Saltis, M.D., a neurologist retained by Evans to provide expert opinions; Drs. Loomus and Szczesniak; Joel Meyer, M.D., a neuroradiologist retained by Evans; Rod Durgin, PhD., a vocational expert retained by Evans; John Burke, PhD., an expert economist retained by Evans; Thomas Walshe, M.D., a neurologist retained by Dr. Loomus; and Ramon Gonzalez, M.D., a neuroradiologist retained by Dr. Szczesniak.

{¶ 9} Dr. Szczesniak testified that with the symptoms reported to him—migraines and extreme headache—one of the things he would be looking for was a subarachnoid hemorrhage. He described that an MRI generates a variety of sequences and that a diagnosis is not made by looking at one sequence in isolation. He acknowledged that a CAT scan best reveals bleeds if it is performed within a day of the bleed. After that, MRIs are more effective. The accuracy of those tests depends on the age of the bleed. He explained that artifact is commonly seen on MRIs and he does not write in his report when he sees artifact. Here, he said that Evans' MRI revealed artifact but no blood.

{¶ 10} Dr. Loomus discussed his examination of Evans and the "classic" symptoms of a subarachnoid hemorrhage. Those classic symptoms include a "thunderclap headache," which he described as a headache with a sudden onset that "builds up really fast like a freight train that knocks you over" and is usually described by the patient as the worst headache of his or her life; "nuchal rigidity," a type of neck

stiffness in which the neck cannot flex down; fever; nausea and vomiting; and sonophobia or photobia. Most people, however, present with a sudden devastating neurologic problem like paralysis or aphasia. Evans had a headache, neck pain, nausea, and vomiting. But he had recently undergone a cardiac catheterization and was administered medications that could cause nausea and vomiting. He had no neck rigidity. He was awake, alert, oriented, and had normal speech and language function. His headache waxed and waned and was not consistent with the distinct headache associated with a subarachnoid hemorrhage. And there were other factors that could explain some of his symptoms. For instance, Evans was a smoker. Nicotine withdrawal can cause agitation, restlessness, nausea, and headache. He had experienced anxiety and panic which can cause muscle spasms. Pain from the prior hand surgery was causing him difficulty sleeping and insomnia can cause headache and dizziness. And he also may have been experiencing caffeine withdrawal which can lead to a headache. Dr. Loomus downplayed the extent of Evans' pain during his hospital stay. He also testified that he has never treated another patient for subarachnoid hemorrhage where they presented the way Evans had.

{¶ 11} Dr. Loomus acknowledged that a person can have a bleed but nevertheless have a normal MRI or CT scan. He acknowledged that the age of the bleed impacts the effectiveness of an MRI or CT scan. He said that if there was an index of suspicion of a subarachnoid hemorrhage, even with a normal MRI or CT, he would proceed to do a

6.

lumbar puncture and then perhaps an angiogram. However, he said that a lumbar puncture is invasive and he would not order a lumbar puncture if there was no indication for it.

{¶ 12} Dr. Saltis testified and opined that Dr. Loomus' treatment of Evans fell below the standard of care. Although he said that the MRI showed blood, his testimony was focused on Dr. Loomus' care. He described the symptoms of a subarachnoid bleed to include a sudden abrupt-onset headache, nausea, vomiting, photophobia, and stiff neck. He believed that Evans' symptoms were, in fact, consistent with a subarachnoid bleed. He felt that the medical records described a severe headache that never resolved. From the absence of any mention of it in Dr. Loomus' consultation note, Dr. Saltis believed that Dr. Loomus failed to inquire about Evans' history of headaches—an allegation Dr. Loomus denied. He agreed that nicotine withdrawal, insomnia, caffeine withdrawal, and anxiety can produce the symptoms described by Dr. Loomus. He also agreed that there was no nuchal rigidity and that the neurologic exam was normal.

{¶ 13} Dr. Saltis said that the attending physician should have ordered a plain CT and, if negative, Dr. Loomus should have proceeded to do a lumbar puncture and perhaps an angiogram. He indicated that the negative MRI required the same action of Dr. Loomus. He believed that Evans experienced a warning bleed on August 11, 2008, and, if the bleed had been identified, the aneurysm could have been coiled and Evans' neurologic deficit could have been avoided.

7.

{¶ 14} Dr. Meyer described the mechanism of an MRI and identified the sequences where a bleed can best be located. He noted that CT scans are more commonly ordered when a subarachnoid hemorrhage is suspected, but he showed the jury the images on the MRI where the bleed could be seen. Like Dr. Szczesniak, he too saw some artifact on certain sequences, but he also saw a bleed. He opined that Dr. Szczesniak breached the standard of care by failing to identify the subarachnoid hemorrhage when he interpreted the MRI.

{¶ 15} Dr. Walshe testified that a headache is the cardinal symptom of a subarachnoid hemorrhage. He knows of cases where the headache was minimal, but most patients have a "big headache." He said that there are usually neurologic findings such as weakness, confusion, trouble with sensation, and blurred vision associated with a bleed. He did not feel that Evans' symptoms were consistent with a subarachnoid bleed. He did not believe his headache constituted a "thunderclap" headache, there was no nuchal rigidity, and he agreed that some of the factors Dr. Loomus discussed were consistent with Evans' symptoms. He believed Evans' headache was consistent with muscle tension.

{¶ 16} Dr. Walshe explained that an MRI can rule out a number of conditions and a negative MRI is reassuring. He agreed that a bleed can be best seen on a CT if the scan is performed on the first day and he said that MRIs performed in the days following the onset of the bleed are very sensitive to blood. The MRI did not appear abnormal to him. He agreed that a lumbar puncture is more specific than a CT or MRI if you are

8.

investigating a subarachnoid hemorrhage. Although he agreed that a negative MRI by itself would not rule out a subarachnoid hemorrhage, based on Evans' presentation along with the normal MRI, the standard of care did not require Dr. Loomus to perform a lumbar puncture. He testified that Dr. Loomus' treatment and his decision not to perform a lumbar puncture or angiogram was within the standard of care.

{¶ 17} Dr. Gonzalez agreed with Dr. Szczesniak's interpretation of the MRI as normal. He too saw artifact but no blood. He discussed the strengths and weaknesses of the various imaging sequences generated by an MRI and explained that the sequences have to be interpreted together. He said that it is a very small percentage of patients who have a bleed that does not show up on imaging studies. Because there are such patients, however, the treating physician must use his or her clinical judgment and evaluate the patient's presentation. He expressed that a lumbar puncture should not be performed without some clinical indication and that lumbar punctures are less commonly performed now because of the availability of imaging studies. He said that where there is a worry for subarachnoid hemorrhage, an angiogram should be performed even with a normal imaging study.

{¶ 18} The jury rendered a verdict in favor of Dr. Szczesniak and Advanced Radiologic Physicians, Inc., on September 5, 2013, which was memorialized in a judgment entry journalized on September 13, 2013. It also rendered a verdict in favor of

9.

Dr. Loomus and Toledo Neurological Associates, Inc., which was memorialized in a judgment entry journalized on October 3, 2013. It is from those judgments that Evans filed this timely appeal. He assigns the following errors for our review:

I. THE TRIAL COURT ERRED BY NOT ALLOWING PLAINTIFFS' EXPERT, DR. CHARLES LANZIERI, TO TESTIFY.

II. THE TRIAL COURT ERRED WHEN IT RULED PLAINTIFFS COULD NOT INTRODUCE EVIDENCE OF MEDICAL LITERATURE.

III. THE TRIAL COURT ERRED WHEN IT REFUSED TO ALLOW TESTIMONY CONCERNING DEFENDANT DR. LOOMUS' PRIOR RELATIONSHIP WITH DEFENDANT DR. SZCZESNIAK AS AN EXPERT WITNESS.

IV. THE TRIAL COURT ERRED IN INSTRUCTING THE JURY ON DIFFERING METHODS.

V. THE CUMULATIVE EFFECT OF THE TRIAL COURT'S ERRORS WERE PREJUDICIAL AND DEPRIVED PLAINTIFFS OF A FAIR TRIAL.

**B.  Standard of Review**

**{¶ 19}** In his five assignments of error, Evans challenges three of the trial court's evidentiary rulings and one of its instructions to the jury. The admission or exclusion of evidence is a matter solely within the discretion of a trial court. *Miller v. Defiance Regional Med. Ctr.,* 6th Dist. Lucas No. L-06-1111, 2007-Ohio-7101, ¶ 17. A reviewing

10.

court may reverse a court's decision only where the trial court has abused its discretion. *Id.* To find an abuse of discretion, we must determine that the trial court's decision was unreasonable, arbitrary, or unconscionable and was not merely an error of law or judgment. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 20} Similarly, a trial court's decision regarding whether the evidence produced at trial warrants a particular jury instruction is generally reviewed for an abuse of discretion. *Miller* at ¶ 40, citing *Chambers v. Admr., Ohio Bur. of Workers' Comp.,* 164 Ohio App.3d 397, 2005-Ohio-6086, 842 N.E.2d 580, ¶ 6 (9th Dist.). A requested jury instruction should ordinarily be given if it is a correct statement of the law, it is applicable to the facts of the case, and reasonable minds might reach the conclusion sought by the instruction. *Id.,* citing *Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 591, 575 N.E.2d 828 (1991). We review the jury instructions as a whole to determine whether or not the instructions likely misled the jury in a matter materially affecting the substantial rights of the party who claims error. *Id.,* citing *Becker v. Lake Cty. Mem. Hosp. West*, 53 Ohio St.3d 202, 208, 560 N.E.2d 165 (1990).

### C. Analysis

*1. First Assignment of Error: The Trial Court's Exclusion of Expert Witness.*

{¶ 21} In his first assignment of error, Evans argues that the trial court erred in prohibiting him from calling neuroradiologist, Charles Lanzieri, M.D., to provide expert testimony at trial. Dr. Lanzieri practices at University Hospital in Cleveland. Evans first identified Dr. Lanzieri as a potential expert witness in May of 2012.

{¶ 22} At Evans' request, Dr. Lanzieri conducted a blind review of the August 13, 2008 MRI—in other words, he reviewed the images having been provided only the information that was known to Dr. Szczesniak at the time of interpreting the MRI and without information as to the patient's outcome. Dr. Lanzieri purportedly told plaintiffs' counsel that he saw evidence of a subarachnoid bleed in the August 13, 2008 MRI, and that Dr. Szczesniak's interpretation of the MRI fell below the standard of care. It was Evans' position that if the bleed had been identified on August 13, 2008, the coiling procedure could have been performed earlier, and he would have been spared the neurologic deficit he experienced.

{¶ 23} After Dr. Lanzieri reported his opinions to Evans' counsel, he learned that his employer, University Hospital, would not permit him to provide expert testimony. Dr. Lanzieri remained on Evans' witness disclosure, but it was allegedly conveyed to defense counsel that Evans would be calling another neuroradiologist, Joel Meyer, M.D., and that he merely "reserved the right" to call Dr. Lanzieri. In response to requests by defense counsel to depose Evans' witnesses, Evans' counsel provided dates for his other witnesses, but not for Dr. Lanzieri. He told defense counsel that he would contact Dr. Lanzieri if they wished, but could not guarantee his cooperation. Defense counsel made no request that Evans contact Dr. Lanzieri.

{¶ 24} The case proceeded toward trial and defendants remained under the impression that Evans had abandoned his earlier intent to call Dr. Lanzieri. On July 18, 2013, however, Evans indicated that he planned to subpoena Dr. Lanzieri and that Dr.

12.

Lanzieri did not intend to challenge the subpoena. This revelation posed a problem because as it happened, on August 19, 2010, counsel for Dr. Szczesniak had submitted Evans' films to Dr. Lanzieri for a blind review. Evans' counsel discovered this because Dr. Lanzieri provided him with notes written on the back of Dr. Szczesniak's attorney's letterhead. Dr. Lanzieri's opinions were not favorable to Dr. Szczesniak, so Dr. Szczesniak instead retained Dr. Gonzalez to provide opinions supporting his care. Debate then began over whether Evans could call Dr. Lanzieri to testify. This became the subject of motions in limine.

{¶ 25} Dr. Szczesniak filed the first motion in limine to preclude testimony from Dr. Lanzieri on July 22, 2013. Dr. Loomus filed a similar motion the next day. They argued that Dr. Lanzieri should be precluded from testifying because (1) it violated defense counsel's work product privilege, (2) it was highly prejudicial, (3) the testimony would be cumulative because Evans was also presenting Dr. Meyer's opinions, (4) Evans' delay in disclosing that he intended to call Dr. Lanzieri constituted "trial by ambush," and (5) the witness was never made available for deposition.

{¶ 26} In response, Evans pointed out that Dr. Lanzieri had been repeatedly identified as a potential expert as early as May of 2012, yet defense counsel never raised any objection and made no claim of work-product privilege at that time. He also indicated that he had offered multiple times to contact Dr. Lanzieri to obtain his cooperation in appearing for a deposition, but defendants never pursued this offer. Evans claimed that Dr. Lanzieri's opinions were known to defense counsel since they had, in

fact, spoken to him early on in the case. He insisted that he never withdrew Dr. Lanzieri from his witness list. And he argued that Dr. Lanzieri's and Dr. Meyer's testimony would not be cumulative because two neuroradiologists would be testifying in support of defendants' positions—one called by Dr. Szczesniak and one by Dr. Loomus—thus it would merely level the playing field.

{¶ 27} In his reply brief, Dr. Szczesniak explained that there previously appeared to be no need to divulge that his counsel had spoken to Dr. Lanzieri given that Evans represented that University Hospital would not permit Dr. Lanzieri to testify. He also argued that he did not waive work-product privilege because it was not until July 18, 2013, that counsel learned that her correspondence and notes from her conversation with Dr. Lanzieri had been provided to plaintiffs. At that point, Dr. Szczesniak promptly objected and filed a motion in limine.

{¶ 28} Ultimately, the trial court precluded plaintiffs from calling Dr. Lanzieri in their case-in-chief, but reserved any ruling on whether he would be permitted to testify on rebuttal. The trial court also indicated that defendants would be permitted to depose Dr. Lanzieri before he provided any in-court testimony.

{¶ 29} At trial, plaintiffs made a proffer of Dr. Lanzieri's testimony, indicating that he would have testified to seeing a bleed on the August 13, 2008 MRI images, and that it was a breach of the standard of care for Dr. Szczesniak to fail to identify that bleed. At that time, the court memorialized in greater detail some of the dialogue that had taken place in chambers during a pretrial conference on August 23, 2013. The court noted that

14.

Dr. Lanzieri apparently had no conflicts procedure in place, Evans had represented that he would not be calling Dr. Lanzieri, Evans could articulate no strong reason to call Dr. Lanzieri other than the attractiveness of the fact that he had previously reviewed the films for the defense, Dr. Lanzieri's testimony would have been cumulative, defense counsel did not have sufficient time to prepare for Evans' use of Dr. Lanzieri's testimony at trial, and the prejudice to defendants outweighed the probative value of the evidence. The court reiterated that it was reserving judgment as to the use of Dr. Lanzieri's testimony on rebuttal. Evans did not ultimately call Dr. Lanzieri.

{¶ 30} In his first assignment of error, plaintiff claims that the trial erred in excluding Dr. Lanzieri's testimony because (1) defendants violated Evans' HIPAA rights and his physician-patient privilege by contacting Dr. Lanzieri given that Dr. Lanzieri was employed by Evans' treating hospital, (2) defendants waived any work-product privilege by failing to assert it for over 14 months, and (3) the trial court improperly relied on defense counsel's untrue representations that Evans conveyed that he no longer intended to call Dr. Lanzieri.

{¶ 31} As previously stated, Evans' coiling procedure was performed at University Hospital. He apparently continues to receive follow-up care there. Dr. Lanzieri is employed by University Hospital, however, there is no evidence to suggest that he ever participated in Evans' care and treatment. Nevertheless, Evans claims that his HIPAA rights and his physician-patient privilege were violated when Dr. Szczesniak's counsel spoke with Dr. Lanzieri about his interpretation of Evans' MRI.

15.

Notably, Evans did not raise this argument in the trial court and improperly raises it for the first time on appeal. We will briefly address it anyway.

{¶ 32} In the context of a medical malpractice action, in considering the "duty" element of the claim, the Supreme Court of Ohio in *Lownsbury v. VanBuren,* 94 Ohio St.3d 231, 236-238, 241, 2002-Ohio-646, 762 N.E.2d 354, determined that a physician-patient relationship may arise in "the institutional environment of large teaching hospitals" without direct or indirect contact between the patient and physician. But determining whether such a relationship exists is a very fact-specific inquiry. *Wazevich v. Tasse*, 8th Dist. Cuyahoga No. 88938, 2007-Ohio-5062, ¶ 48, citing *Lownsbury; see also Everhart v. Coshocton Cty. Mem. Hosp.*, 10th Dist. Franklin No. 12AP-75, 2013-Ohio-2210, ¶ 42. Here, we find that Dr. Lanzieri's mere employment by University Hospital, without any additional information to connect him to Evans' care, is insufficient to create a physician-patient relationship such that any physician-patient privilege existed.

{¶ 33} As for Evans' HIPAA argument:

> In general, HIPAA governs the confidentiality of medical records and regulates how "covered entities" can use or disclose "individually identifiable health (medical) information (in whatever form) concerning an individual." HIPAA has established special rules governing the disclosure of individually identifiable health information. The relevant provisions, which make up the "privacy rule," were promulgated by the Department of

16.

Health and Human Services and are found in 45 C.F.R. parts 160 and 164. *Id.* "The privacy rule prohibits 'covered entities' (generally health care providers who transmit health information in electronic form, see 45 C.F.R. § 160.103) from using or disclosing an individual's 'protected health information' except where there is patient consent or the use or disclosure is for 'treatment, payment, or health care operations[.]'" (Internal citations omitted.) *OhioHealth Corp. v. Ryan*, 10th Dist. Franklin No. 10AP-937, 2012-Ohio-60, ¶ 14.

**{¶ 34}** The films at issue were provided to defendants in connection with Evans' claims against them. As recognized by the Ohio Supreme Court, "[a]n attorney can certainly use medical records obtained lawfully through the discovery process for the purposes of the case at hand—e.g., submitting them to expert witnesses for analysis or introducing them at trial." *Hageman v. S.W. Gen. Health Ctr.,* 119 Ohio St. 3d 185, 2008-Ohio-3343, 893 N.E.2d 153, ¶ 17. Defense counsel provided those films to Dr. Lanzieri—not the other way around. And as we previously indicated, there is no evidence to suggest that Dr. Lanzieri provided care to Evans or that he learned any information about Evans through his employment with University Hospitals. *Compare Biddle v. Warren Gen. Hosp*., 86 Ohio St. 3d 395, 401, 715 N.E.2d 518 (1999) ("An independent tort exists for the unauthorized, unprivileged disclosure to a third party of nonpublic medical information that a physician or hospital has learned within a physician-patient relationship."). He was merely an employee of a large hospital system

where Evans received care. While it may have been prudent to have sought a review by a physician employed somewhere other than the hospital where Evans received treatment, we find no pernicious motive and no HIPAA violation here.

{¶ 35} We next turn to the issues of (1) whether Dr. Szczesniak's attorney's work-product privilege was waived by the 14-month delay in raising it, and (2) whether the court improperly relied on defense counsel's uncorroborated statements in its decision to exclude Dr. Lanzieri's testimony.

{¶ 36} The parties vigorously debated whether Evans had communicated that he did not intend to call Dr. Lanzieri to testify. Defense counsel believed that in informing them that Dr. Lanzieri refused to testify, indicating that Dr. Lanzieri may not cooperate with a deposition request, listing Dr. Meyer as his expert neuroradiologist and making him available for deposition, and merely "reserving the right" to call Dr. Lanzieri at trial, Evans had effectively withdrawn Dr. Lanzieri as a potential witness. As such, defense counsel believed the conflict had resolved itself. Evans' counsel was adamant that he had never withdrawn Dr. Lanzieri and had offered to make him available for deposition.

{¶ 37} It is unclear when Evans became aware that Dr. Szczesniak had consulted Dr. Lanzieri. But up until the month before trial, Evans was equivocal at best about his intention of calling Dr. Lanzieri to testify and it was not unreasonable for Dr. Szczesniak's counsel to believe that the potential conflict was not going to materialize. She was reasonable in expecting that her consultation with Dr. Lanzieri would carry a privilege. And it was clear that Evans had a qualified neuroradiology expert prepared

18.

and willing to testify in support of his position. These were among the trial court's many considerations in granting defendants' motion in limine. We find no abuse of discretion in the trial court's decision.

{¶ 38} We, therefore, find Evans' first assignment of error not well-taken.

*2. Second Assignment of Error: Exclusion of Medical Literature.*

{¶ 39} Evans claims that the trial court erred by prohibiting him from questioning his own expert witness, the defendant doctors, and the defense experts concerning two documents: (1) an excerpt from an article entitled "Aneurism in the Brain, Symptoms and Treatment," printed from the ProMedica Health System website, and (2) an article entitled "Guideline for the Management of Aneurysmal Subarachnoid Hemorrhage," published in January 2009 by the American Heart Association/American Stroke Association and adopted by the American Academy of Neurology ("AHA/ASA article"). He claimed that these documents were admissible as "learned treatises" under Evid.R. 803(18).

{¶ 40} Evans first sought to use these documents during the direct examination of his neurology expert Dr. Saltis. Defendants objected to the use of the article from the ProMedica website on the basis that it was hearsay, not subject to any exception. They disputed Evans' argument that that it was a learned treatise under Evid.R. 803(18). They argued that it was printed in 2013, there was no indication that it existed in August of 2008, no author was identified, Evans produced only page one of four pages, no expert

19.

testified to having relied upon the article in forming his opinions, and it came not from a journal or textbook, but from the web page of a non-party hospital. Evans conceded that Dr. Saltis had not relied on the document in formulating his opinions, but he argued that he could offer the article to the witnesses and have them review it to determine whether or not it was authoritative and reliable. The trial court agreed with the defense and prohibited Evans from using the web materials in his direct examination of his expert.

{¶ 41} Evid.R. 803 sets forth a number of exceptions to the hearsay rule. Subsection (18), at issue here, provides:

> To the extent called to the attention of an expert witness upon cross-examination or relied upon by the expert witness in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits.

{¶ 42} Evans specifically stated that Dr. Saltis had not relied on the information taken from the ProMedica website. On this basis alone, Evans could not use the print-out in his direct examination of Dr. Saltis. The other objections raised by defendants and cited by the trial court were of equal concern. The author and original publication date of the article could not be ascertained from the document, thus a foundation could not be

20.

laid for establishing it as authoritative and reliable or for establishing its applicability at the time of Evans' injury. The document was also an incomplete excerpt. The trial court did not abuse its discretion in prohibiting use of the document.

{¶ 43} The second article posed additional problems. For one, Evans was attempting to use it in his direct examination of Dr. Saltis where Dr. Saltis had not relied on it in formulating his opinions. But more importantly, the article was authored in 2009; Evans' injury occurred in 2008. Evans argued that the article set forth the applicable standard of care. He claimed that it made no difference that the article was published in 2009 because it was based on a systematic literature study of clinical trials published between June 30, 1994 and November 1, 2006. Thus, even though the publication was not in existence in 2008, the underlying information summarized in the article existed.

{¶ 44} The defense objected to Evans' attempt to characterize "guidelines" as establishing the standard of care, especially where those guidelines had not even been published at the time of Evans' injury. It also urged that because the article had not been previously identified, it could not be used on cross-examination. Although the court was not impressed with the argument that only articles that were previously identified could be used on cross-examination, it nevertheless agreed that Evans could not use the article. Its first concern was that the article could not be used on direct under Evid.R. 803(18) because Dr. Saltis had not relied on it in forming his opinions. As far as its use during

cross-examination, the publication date precluded its use. Evans ultimately agreed to use an earlier publication from 1994, but he argues that he should have been permitted to use the 2009 version.

{¶ 45} Dr. Loomus argues that Evans did not preserve his objection because he eventually volunteered to use the 1994 version. Whether or not Dr. Loomus is correct, the trial court's decision was not an abuse of discretion. While the raw data underlying the 2009 guidelines existed at the time of Evans' injury, the document summarizing the various data did not. As such, the protocol established from the data could not have been known to defendants at the time of Evans' injury and the article was properly excluded.

{¶ 46} We, therefore, find Evans' second assignment of error not well-taken.

### 3. Third Assignment of Error:  Dr. Loomus' Prior Relationship with Dr. Szczesniak as an Expert Witness.

{¶ 47} In his third assignment of error, Evans claims that the trial court erred in precluding him from eliciting testimony concerning a lawsuit filed by Dr. Szczesniak and his wife in which the Szczesniaks allegedly identified Dr. Loomus as an expert witness. He argues that the information was relevant to show bias and to impeach Dr. Szczesniak because at his deposition, Dr. Szczesniak testified that his relationship with Dr. Loomus was limited to discussing cases.

{¶ 48} Dr. Szczesniak made an oral motion in limine to preclude Evans from raising this line of questioning. He argued that it was not relevant and that it was improper and prejudicial. Dr. Loomus denied that he was ever retained as an expert.

22.

{¶ 49} The court granted Dr. Szczesniak's motion in limine on the basis that the personal lawsuit was not relevant. Evid.R. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." We agree with the trial court that the fact that Dr. Szczesniak filed a personal lawsuit and identified Dr. Loomus as a potential expert witness does not make the existence of any fact pertinent to this medical malpractice action more probable or less probable than it would be without the evidence. We find no abuse of discretion in the trial court's ruling.

{¶ 50} We, therefore, find Evans' third assignment of error not well-taken.

4. *Fourth Assignment of Error: Jury Instruction on Different Methods.*

{¶ 51} In his fourth assignment of error, Evans argues that the trial court erred in providing the jury with the following instruction:

Although some other physician might have used a method of diagnosis or treatment different from the one used by the Defendant, Dr. Loomus, this circumstance will not by itself prove that he was negligent.

{¶ 52} In giving the instruction, the trial court reasoned:

With regard to Dr. Loomus, there has been testimony by Plaintiff's witnesses, and again, I don't pretend to know if I'm understanding it correctly, but I do have language that has been given with regard to the use of a CT angiogram. There has been language and testimony given that

23.

there should have been a lumbar puncture. Each of these are different methods, choices of diagnosis, and subsequent treatment that would follow if those had been done.

{¶ 53} The premise of the "different methods" charge is that where there is more than one acceptable method of diagnosis or treatment, lay jurors should not be forced to choose which should have been performed. *Branch v. Cleveland Clinic Found.*, 134 Ohio St.3d 114, 2012-Ohio-5345, 980 N.E.2d 970, ¶ 25. The charge is not appropriate in all medical malpractice cases. *Pesek v. Univ. Neurologists Assn., Inc.*, 87 Ohio St. 3d 495, 721 N.E.2d 1011 (2000). It is appropriate only if there is evidence that more than one method of diagnosis or treatment is acceptable for a particular medical condition. *Id.*

{¶ 54} The trial court agreed to include the instruction because there had been testimony about whether a lumbar puncture or angiogram should have been performed to rule in or rule out the diagnosis. However, it is undisputed that neither of these tests was ever performed, thus the jury was not put in the position of deciding which of these two tests was appropriate. That these tests were merely discussed, when neither was performed, should not have led the trial court to give the "different methods" instruction.

{¶ 55} Dr. Loomus argues that the instruction was warranted because there was "competing testimony on whether an MRI versus a CAT scan was the optimal diagnostic tool and/or whether or not the diagnostic criteria included a lumbar puncture." Indeed, there was testimony about the pros and cons of these tests. For instance, there was testimony that only certain sequences of an MRI may reveal a bleed. There was also

24.

testimony that an older bleed may tend to be more visible on an MRI, whereas a newer bleed may be most visible on a CT scan.[2] But Evans' position at trial did not ultimately turn on whether an MRI or a CT was the preferable test to obtain. In fact, Dr. Loomus did not order the MRI—the attending physician did. Evans' position was that despite the negative MRI, his symptoms warranted additional diagnostic testing in the form of a lumbar puncture or perhaps an angiogram. He described those symptoms as neck pain, nausea, vomiting, sensitivity to light, and most importantly, a "thunderclap" headache.

{¶ 56} In support of its decision to instruct on different methods, the trial court relied on our opinion in *Miller v. Defiance Regional Med. Ctr.*, 6th Dist. Lucas No. L-06-1111, 2007-Ohio-7101. In *Miller,* the defendant neurosurgeon who examined the patient believed that she had either a brain tumor or a stroke, but that a brain tumor was most likely causing her symptoms. *Id.* at ¶ 5. Instead of referring the patient to a neurologist, the defendant performed a brain biopsy. *Id.* He prescribed steroids and anti-seizure medication but did not prescribe anticoagulants. *Id.* The patient's condition worsened. *Id.* He performed a craniotomy and discovered a lack of blood flow in an area of her brain, but was not convinced that she did not have a brain tumor. *Id.* at ¶ 6. He took tissue samples from the brain. *Id.* Pathology results ultimately confirmed that the patient had a stroke and not a brain tumor. *Id.* He ordered an angiogram and a neurology consult, but because of the timing and the size of the affected area, there was nothing more that a neurologist could have done. *Id.* The patient became comatose and died. *Id.*

---

[2] "CT scan" and "CAT scan" are used interchangeably.

25.

**{¶ 57}** The plaintiff claimed that the defendant was negligent because he failed to recognize that the patient had suffered a stroke, did not properly treat her for a stroke because he failed to prescribe an anticoagulant, and exacerbated her condition by performing a craniotomy. *Id.* at ¶ 21. His expert testified that the defendant should not have assumed that the patient's condition was caused by a tumor, that he should not have operated on an ischemic stroke, and that this surgery directly led to the patient's death. *Id.* at ¶ 23-24. He indicated that he would have ordered heparin, bed rest with the patient's head at a thirty degree angle, and no food until a swallowing study was done, and that he would have monitored to ensure that the patient's blood sugar never went above 140, ordered close nursing observation, and kept her hydrated. *Id.* at ¶ 35.

**{¶ 58}** The defendant insisted that he did treat the patient for stroke by keeping her in the hospital for observation, managing her blood pressure and her blood sugar, and keeping her hydrated. *Id.* at ¶ 47. He also presented testimony from an expert who opined that he would be deeply concerned about using anticoagulants, such as heparin, in treating the patient's acute type of stroke because it would not have any "salutorious" effect, but had the potential to aggravate the patient's "dead brain" by causing bleeding. *Id.* at ¶ 32. Based on the differing opinions as to how the patient's stroke should have been treated, we found no error in instructing the jury on "different methods." *Id.*

**{¶ 59}** The Ohio Supreme Court has held similarly. In *Branch*, 134 Ohio St.3d 114, 2012-Ohio-5345, 980 N.E.2d 970, the patient suffered a stroke during a procedure called "deep brain stimulation." *Id.* at ¶ 6-7. The parties presented competing expert

26.

opinions as to whether defendants used the proper approach in creating a map of the patient's brain, whether a different trajectory should have been used, and whether there was a better site for electrode placement. *Id.* at ¶ 28. The court found that these differing opinions as to how alternate planning and procedures could have prevented the patient's stroke required the jury to determine whether another medical approach would have been preferable. *Id.* at ¶ 27-28. It held that the "different methods" instruction was, therefore, appropriate. *Id.* at ¶29.

{¶ 60} There are also decisions to the contrary. In *Peffer v. Cleveland Clinic Found.*, 117 Ohio App.3d 403, 2008-Ohio-3688, 894 N.E.2d 1273 (8th Dist.), for instance, the Eighth District Court of Appeals held that the "different methods" instruction was improperly given. There, plaintiffs alleged that defendants failed to timely diagnose herpes simplex encephalitis ("HES") and to presumptively administer acyclovir, an antibiotic. *Id.* at ¶ 14. Plaintiffs claimed that the failure to diagnose resulted from the defendants' assumption that the results of a CT scan showed no brain abnormality. *Id.* In fact, the results of the CT scan indicated that medial temporal lobe abnormality could not be ruled out and that "if clinically indicated, follow-up MRI may be helpful." *Id.* at ¶ 4. Plaintiffs argued that the defendants were negligent in failing to promptly suspect HSE, order an MRI to rule out the diagnosis, and begin the patient on acyclovir. *Id.* at ¶ 14. The defendants argued that there was no reason to suspect HSE given the patient's clinical history, his clinical course, and the data from testing, including the "normal" CT scan. *Id.* at ¶ 15.

27.

{¶ 61} The trial court instructed the jury on "different methods" and the jury found the defendants not liable. The appellate court found the instruction inappropriate, reversed the judgment, and remanded for a new trial. *Id.* at ¶ 37. It reasoned that "the central issue in the case was whether the CT scan * * * had been properly interpreted and whether the HSE condition was timely diagnosed." *Id.* at ¶ 36. It concluded that that there was no evidence that more than one method was acceptable to diagnose HSE and that the instruction may have given the jury the impression that it should not find defendants negligent if they merely made a choice between alternative methods of diagnosis. *Id.* at ¶ 35-36.

{¶ 62} The court reached the same conclusion in *Kowalski v. Marymount Hosp., Inc.,* 8th Dist. Cuyahoga No. 87571, 2007-Ohio-828. There, the patient was twice diagnosed with bronchitis over a two-month period—the first time by her family physician and the second time by an E.D. physician. *Id.* at ¶ 3-4. Her family physician ordered an X-ray to rule out pneumonia. *Id.* at ¶ 3. The E.D. physician ordered an X-ray which revealed a normal-sized heart and no evidence of infiltrate or congestive heart failure. *Id.* at ¶ 6. The day after the patient's E.D. visit, she collapsed from a heart attack and died. *Id.* at ¶ 7. The coroner determined that the cause of death was "coronary sclerotic heart disease with acute coronary thrombosis, and remote organizing and acute myocardial infarcts." *Id.* at ¶ 8. The autopsy showed no evidence of acute or chronic bronchitis. *Id.* at ¶ 11.

28.

**{¶ 63}** Plaintiff claimed that both doctors should have done a cardiac workup based on the patient's symptoms and risk factors. *Id.* at ¶ 14. The patient's family physician argued that he properly treated her for bronchitis, she did not have a cardiac condition, and a cardiac workup would not have revealed any significant findings. *Id.* at ¶ 12. The E.D. physician argued that he properly ruled out a cardiac condition and did not deviate from the standard of care by failing to order a cardiac workup. *Id.* at ¶ 13.

**{¶ 64}** At trial, the court instructed the jury on differing methods. The family physician contended that this was proper because he had presented competent, credible evidence supporting his diagnostic methodology and the patient had no diagnosable indicia of cardiac or coronary artery disease. *Id.* at ¶ 18. The E.D. physician contended that it was proper because there was testimony at trial establishing alternative methods of diagnosis for the patient's symptoms. *Id.* at ¶ 19. The appellate court concluded that the instruction was improper and had confused the jury. *Id.* at ¶ 25. It explained that "where the issue involved is whether the physician negligently failed to diagnose a particular disease from the observed symptoms, the instruction is misleading to the jury." *Id.* at ¶ 22. The court determined that the issue in the case was "not whether the doctors chose between two recognized methods of diagnosis, but whether they negligently failed to recognize that [the patient's] symptoms required that they perform a cardiac workup to rule out coronary artery disease as a cause of those symptoms." *Id.* at ¶ 23. It reversed and remanded for a new trial.

29.

{¶ 65} At its heart, we find that this case is more like *Peffer* and *Kowalski* than it is like *Branch* or *Miller*. Although the testimony revealed a number of tests that could be performed, the physicians who testified agreed that a normal imaging study could not definitively rule out the presence of a subarachnoid hemorrhage. The evidence was that whether to perform a more invasive test that would rule out the condition was guided by whether the patient's clinical symptoms warranted more conclusive testing.

{¶ 66} At trial, Dr. Loomus testified on direct examination, "Well, if I was concerned about a - - of a subarachnoid hemorrhage and the MRI is read as normal, I would want to go over it and say, you sure there's no blood[?] * * * If I was concerned I would have done the [spinal] tap. * * * I mean, if you're thinking meningitis or a bleed you've got to do the spinal tap." He provided more detail on cross-examination:

Q: I'm just asking typically, I want to find out the way these are typically investigated, suspected subarachnoid hemorrhages. They are typically investigated with a - - by a non-contrast CAT scan?

A: It depends on when you are seeing the patient. As we heard earlier, they evolve. So if you do the CAT scan a week afterwards, it's going to be useless, you need an MRI. If you do it in the first three hours the MRI is useless, you need a CAT scan. So it depends when you see the patient relative to the onset of the headache.

Q: How about if we can agree on this; an imaging study, whether it's a CAT scan or MRI?

30.

A: Yes.

Q: And isn't it true that those things are not 100 percent completely diagnostic, they may have a five to ten percent range where they will miss a sentinel bleed?

A: I know the CTs are about five percent off if you get them within the first three or four hours. MRIs I'm not sure but it would not surprise me if it's five to ten percent off, yeah.

Q: As a result of that suspected subarachnoid hemorrhage in terms of the protocol that neurologists are expected to follow - -

A: Right.

Q: - - if you - - in the face of a negative film, negative diagnostic study such as a CAT scan or an MRI, the second step is a lumbar puncture, is that correct?

A: We are talking about a hypothetical patient where there's an index of suspicion of a subarachnoid hemorrhage - -

Q: Yes.

A: - - with a normal CAT scan or MRI, would a lumbar puncture be the next step?

Q: Yes.

A: Yes, it would.

Q:  I am just trying to establish, you know, what the protocol is for a suspected subarachnoid hemorrhage.

A:  But the key there is suspected, so yes, you're right, lumbar puncture is the next step.

Q:  And then if the lumbar puncture is either positive or equivocal, then the next step is a CTA?

A:  That's reasonable.  Next step would be some sort of angiogram.

{¶ 67} The defense experts' testimony was consistent.  Dr. Walshe agreed on re-direct that if clinical symptoms are present, a negative MRI is not enough to rule out a subarachnoid hemorrhage and a lumbar puncture should be performed.  Dr. Gonzalez testified similarly:  "If properly evaluated by someone who is qualified to evaluate subarachnoid hemorrhage, and that individual is properly trained, believes the signs and symptoms of the subarachnoid hemorrhage in the CT or imaging studies are negative, lumbar puncture is what is commonly selected [sic]."

{¶ 68} Dr. Loomus' decision to forego additional testing rested on his evaluation of Evans' clinical presentation.  Dr. Loomus did not agree that Evans' headache was a "thunderclap" headache.  He determined that Evans' symptoms—particularly the absence of a "thunderclap" headache and nuchal rigidity—combined with what he believed was a negative MRI, was inconsistent with a subarachnoid hemorrhage and justified his failure to obtain more conclusive testing.  So the real issue presented by plaintiff was not whether a CT scan should have been ordered instead of an MRI; indeed, the MRI had

32.

already been ordered and interpreted by the time he saw Evans. It was whether Dr. Loomus should have proceeded to the next step and performed a lumbar puncture or perhaps an angiogram. The instruction on "different methods," therefore, could easily have misled the jury. Accordingly, we find that the trial court abused its discretion in providing the "different methods" instruction.

{¶ 69} We find Evans' fourth assignment of error well-taken as to Dr. Loomus.

5. *Fifth Assignment of Error: Cumulative Effect of the Trial Court's Errors.*

{¶ 70} In his fifth assignment of error, Evans argues that the cumulative effect of the trial court's errors deprived him of a fair trial. Because we find no errors that would impact the jury's verdict as it concerns Dr. Szczesniak, we find that the court's rulings did not deprive Evans of a fair trial. However, as indicated above, we do find that the court's instruction on different methods may have confused the jury and impacted its verdict. *See, e.g., Kowalski,* 8th Dist. Cuyahoga No. 87571, 2007-Ohio-828 at ¶ 25 (finding that "because the instruction 'probably misled the jury in a matter substantially affecting the complaining party's substantial rights,'" a new trial was warranted). We, therefore, find that the case should be remanded and retried as to Dr. Loomus.

{¶ 71} We find Evans' fifth assignment of error well-taken, in part, and not well-taken, in part.

### D. Conclusion

{¶ 72} To the extent that Evans' five assignments of error pertain to Dr. Szczesniak, we affirm the judgment of the trial court. To the extent those assignments of

33.

error concern Dr. Loomus, we find the fourth and fifth assignments of error well-taken and the first three assignments of error not well-taken. As to Dr. Loomus, we reverse the October 3, 2013 judgment of the Lucas County Court of Common Pleas and remand for a new trial consistent with this decision. As to Dr. Szczesniak, we affirm the September 13, 2013 judgment of the Lucas County Court of Common Pleas. The costs of this appeal shall be shared equally between Evans and Dr. Loomus pursuant to App.R. 24.

Judgment affirmed, in part
and reversed, in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

_____
JUDGE

Arlene Singer, J.

James D. Jensen, J.
CONCUR.

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.sconet.state.oh.us/rod/newpdf/?source=6.